This case has come to this Court on a Certificate of Appealability under the Jackson Standard Review regarding sufficiency of the evidence. As a trial lawyer, it's hard not to give a closing argument since we're here under sufficiency. I do some appellate work, and especially since this is the red bra case where someone was allegedly murdered with a red bra. It's a compelling case, and so if I get into closing argument mode, water me down. In any event, Your Honors, the standard of review is rather layered in this type of case. There's a couple questions. First of all, you have whether or not the application of the DEPA as applied to the last reasoned decision in this case violates the standards set down in Jackson and Winship, two seminal cases from long ago on sufficiency of the evidence and all the elements needed to be proven. Then you have Juan H. from this circuit saying that there's a layer of deference given to Jackson claims. Presumably that's in favor of the government in terms of Jackson claims. And then beyond that, you have Miller L. v. Cockerell from the Supreme Court, which says that deference does not mean abdication. And deference is not without its limits. So in this case, you kind of have to go down two wormholes, as it were. You have to go down the wormhole of the merits of the case, in that my client was convicted of murder in the first degree. I was not trial counsel. And the second wormhole you have to go down is whether or not the California appeals, the Court of Appeals opinion, was objectively unreasonable and contrary to federal law, that being Jackson and Winship in the Fifth and Fourteenth Amendments to sufficiency of the evidence. As to the merits of the case, this was a jury that was charged heavily. This was a record that showed a free-for-all in a garage between a woman and an older man. It is undisputed that this man came on to her and made several sexual advances to her. The man came up behind her at one point. She felt his erect penis against her. They were dancing. She was much younger than him, and she was just dancing with him to indulge him. He had bear hugged her a couple times. What the record reveals is an out-and-out fracas in that garage. She admitted to the police that she put the bra around his neck for about three seconds, and then she did it for about 25 seconds. What is not clear, and the problem in this case for the government, and where I would say the jury acted irrationally, and this is compelling, is that the first question from the jury was a readback of the coroner's testimony for the government. The coroner's testimony was heavily impeached by the defense attorney in this case, and it was rather incredulous. The theory of the government was that this man was strangled with a red bra. The coroner saw ligature marks on this man's neck of five millimeters in width, clearly not the width of a bra. He could not say that anything had even been around the person's neck except for those little lines, and, indeed, Ms. Chavez, my client, testified in front of the jury that she had dragged him and had tried to perform CPR on him after this out-and-out brawl she got into him with in the garage. Indeed, she said she tried to perform CPR on him. The government's coroner, Dr. Sheridan, that I'm speaking about, said that the medical evidence indicated on his sternum that it appeared someone had tried to perform CPR on him. Now, let me ask you this. Yes, Your Honor. The ligature marks on the neck are five millimeters, you say? Yes, Your Honor. And how wide is the narrowest part of the bra strap? It was not in the record as to the width of the bra strap or any part of the bra. That is not in the record. They did ask to see the bra. On the first day of deliberations, they asked for a readback of Dr. Sheridan's testimony, and they asked to see the bra, and all they were provided was a picture. But it didn't make it into the record as to no one knew if she did out-and-out murder him with the bra, what part she used. You mean it isn't in the record about the bra or the picture of the bra is not in the record? The picture of the bra is in the record. The width of the bra or what part was presumably used to put around his neck was not in the record. I don't know a lot about bras, but I don't know if there's a part.  We would be worried if you did. We're in the Ninth Circuit. We're in the Ninth Circuit, actually, too. It's kind of liberal here, but anyway. Not that liberal. My wife would want to know how about that. In any event. Did we have a picture of the bra in the excerpt? No, I do not. I don't think it's in the excerpts of the record. I did not lodge that picture. But it's in the record. It is indeed in the record. Because I've not seen that picture. Nor have I. I do not think I would reasonably submit that there is a part of a bra that is five millimeters in width. Certainly not one. Five millimeters is, I think, it's probably a tenth of an inch. I guess we could ask for other dimensions of the bra, et cetera, et cetera. But it really, we better move on. Well, she testified that she dragged him after this fight. What happened, I think, in the garage, and conceitedly, you have bad facts. You have a warrant out for my client. You have her talking to her girlfriend on the phone, talking about something suspicious. You have her trying to flee, perhaps, when she leaves, when the police execute a warrant to arrest her. But that does not a first-degree murder make.  She testified she was warding off a sexual attack of some sort, or some horrible advance. They got in a fight. He's an older man. He was very drunk. It sounds like he fell down and hit his head. She put the bra around his neck to stun him and say, knock it off, and I'm upset with you. And she performed CPR on the guy to try to save his life. The problem with your argument is that we have to take the facts in the light most favorable to the prosecution's evidence. So what could have happened, it doesn't help you. This is true. The jury was, yes, Roni? I mean, here's my problem with the case, and I'm sympathetic to the arguments that you're making, but here's my problem. It's pretty clear the jury has plenty of evidence from which it could conclude, under the standards that were supposed to apply, that she killed him. The issue for me, then, is, okay, well, is it manslaughter, is it second degree, is it first degree? And your basic argument is, listen, there's no way this is a first-degree case. Maybe at most it's a second-degree case, maybe voluntary manslaughter. I mean, clearly they were fighting. Any jury could easily have said, well, what she did to him killed him. He's drunk, he's tiny, he's older, easily killed. Well, as any trial lawyer would say, soaking wet, this is a second. But it seems to me like a voluntary manslaughter. The jury was charged heavily with all the right instructions. The first thing they asked for was Dr. Sheridan's testimony and picture of the bra.  I think that they got it wrong. The second wormhole we go down is whether or not the California Court of Appeals' opinion is objectively unreasonable. And it is. It distorts the record as to what Dr. Sheridan said. He couldn't tell how long anything had been around the victim's neck. He wasn't even sure if there was a bra around his neck in any event. He testified that maybe somebody could die within 25 seconds to three minutes, which is a huge span of time in terms of strangulation. He wasn't sure if the death occurred by ligature strangulation at all. He was incredibly equivocal. And the California Court of Appeals' opinion gives the impression that he was rather right on the money and got it right. Now, here's a problem for your side of the case in terms of the size of the ligature mark, assuming that that's what it was, and the argument that, I guess I'm going to go back and try and find a picture of the bra. Thank you. But it's entirely possible, likely, I don't know, at least it's entirely possible that there is some mark on his neck and that he was also strangled by the bra. If the bra was, the straps were large enough, leaving no mark. There was an officer in this case that testified, Curtis Lackman. He was the first officer to walk into the house, walk into the ranch house, walk forward, walk to the left into the garage, and saw a T-shirt bunched up around the victim's neck. So with due respect, Your Honor, it's rather belied by how the body was found. Well, but the T-shirt around his neck sounds to me as though that's likely explained by her performing some form of CPR and compression on the chest. I wouldn't be surprised if, you know, you lift up the T-shirt in order to do it more. I mean, I don't know for sure, but I'm trying to figure out is that inconsistent with an earlier strangulation with a bra. I don't think the T-shirt around the neck is inconsistent with that. The T-shirt, though, is consistent with the very thin, just the only ligature marks around the neck with this very thin line. Yeah, I understand that. But what I'm saying is I think it's possible that you could have a mark, but that mark wasn't responsible for the strangulation. The mark may be irrelevant to the strangulation. It's possible that if the bra had been used to, as she indeed said, I mean, I was choking him for, you know, up to 20-some seconds the second time around with the bra. It's highly possible that did not leave a mark. Because, you know, if it's thick enough, you're not going to get a mark. If it's a narrow wire, of course you are, but, you know. The driver's license indicated he was 67 years old, 5 feet tall, 130 pounds, though Espinoza thought he looked thinner. Right, and at that time my client was 5 feet 5 1⁄2 and 102 to 104 pounds. And it sounded like, Dr. Sheridan said in this case, we'll never know the details. It sounded like a knock-em-out, drag-em-out fight in that garage. There's just, even if you have evidence of clean-up, that she and her girlfriend performed a clean-up, or even if she did the clean-up herself, to yoke her with murder in the first degree with an indeterminate term of 25 years to life, is an irrational jury. There was water on the floor, too. There was. There was water. I would be as much an irrational jury as an irrational prosecutor. I mean, this case seems to me heavily overcharged. I mean, that's not my affair. I don't get to decide that. And also the California Court of Appeals also mentions nothing about express malice in this case. My learned adversary and I disagree on whether or not express malice has to be proven in the case and whether or not the evidence some show that. The opinion also mentions four cases in terms of showing premeditation and deliberation, which are clearly distinguishable from this case. Tragic death penalty cases. I mean, child murders. Clear chasing people down the road, choking them out for five minutes. There's a case in the California Court of Appeals, a decision on this case called Benias, which is, I'm running out of time, which is where a knot was put around, which is where a ligature was put around a woman's neck so tight and knotted so tightly they had to cut it off. The decisions relied on by the CA in this case were clearly distinguishable from this case. My client, under ACOA in this case, would plead with this court to reverse this case and issue an order to the district to grant the right. Thank you. Thank you. Thank you. Good morning. May it please the Court. Deputy Attorney General Steve Auden on behalf of Respondent. I'd like to begin by touching briefly upon the standard of review and then going to the merits of the claim. We filed on Monday a 28-J letter reminding the courts of the recent decision in Cabellus v. You rather hurt my feelings. I mean, we are well aware of that case. And well aware of the standard. I don't think we have to be reminded. Thank you, Your Honor. Then touching upon the merits of the case, counsel describes this as a free-for-all, but that is not what the record suggests. The record suggests that the defendant unleashed a one-sided attack against an inebriated 5'1", 118-pound, 67-year-old man. The evidence at the crime scene suggested there was blood all over the place. There's blood on the floor. There's blood on the walls. There's blood on the base of a broom, indicating that she was beating him with a broom. The autopsy revealed that he had bruises from head to toe all over his face, all over his entire body. Two of his teeth were loose. He had a fractured rib, which was separate from the potential CPR injury to his sternum, which Dr. Sheraton suggested might have been postmortem. This was not a free-for-all. The defendant, on the other hand, had virtually no injuries, with the exception of perhaps some slight bruising to the hands. This was not a free-for-all. This is a one-sided attack that went on for a minimum of 25 minutes. She took the bra in a trial run for three seconds, according to her own statement. She took the bra – after doing so, then, she tried it again for 25 seconds. You mean wrapped around him? Correct, Your Honor. Why do you call it a trial run? Did she use the term trial run? No, she did not, Your Honor. These are her self-serving statements to the detectives. No, I understand any statement by her would be self-serving. I mean, when somebody's trying to exonerate herself or exculpate, of course they're self-serving. No, my question to you is, did she use the term trial run? No, she did not, Your Honor. But this is the people's view of the evidence, and this is the evidence viewed in the light most favorable to the Supreme Court. So she – but that goes to planning. And, of course, this Court examines the record under the context of the three Anderson factors under California law, which are planning, motive, and method of execution. I would suggest to the Court that this Court's decision in Davis v. Woodford is directly on point. That case also involves a case of strangulation where this Court looked to the manner of execution in and of itself as being sufficient, stating that whether viewed in isolation or in conjunction with other evidence, the manner of killing evidence was sufficient to sustain the verdict in that case. Similar to this case, this is not simply a reflexive motion with a handgun, pulling the trigger without due deliberation. This is an actual strangulation that took a minimum of 25 or 30 seconds. The victim would have become unconscious before he died, and then the strangulation would have continued after the victim was unconscious. It simply cannot be said under these facts that no rational juror could have concluded that this was a deliberate and premeditated act. Turning to the 25 seconds would kind of throw a flag up the pole to me. Isn't that evidence somewhat weak of premeditation, 25? Get him down to 25 seconds. Your Honor, 25 seconds was longer than Mr. Cain paused the other night, and yet that was sufficient to send his entire campaign into the dustbin. Twenty-five seconds is quite a bit of deliberation, Your Honor. Let me show. If we were to sit here and pause for 25 seconds. Thank you, Your Honor. If we were to pause for 25 seconds, that length and that duration would become painfully obvious. That was what she said, 25 seconds. The coroner, of course, testified that it was a minimum of 30 seconds to perhaps as long as three minutes. But the coroner testifies based upon the ligature mark, or does he testify based on I can't tell if there was any mark from the bra and it's a minimum of 30 seconds? I'm sorry, I didn't catch that. When the coroner says it's a minimum of 30 seconds, is he basing that time estimate on the nature of the ligature mark? No, the death, the cause of death was by ligature strangulation. And whether or not the But now by ligature, do you mean that five millimeter thing or do you mean the bra? Well, the coroner can determine that it was ligature strangulation, and that's based upon typically the hemorrhaging to the eyes. And whether or not the five millimeter mark around the neck was the ultimate ligature that caused the strangulation as opposed to a manual strangulation Or by the bra. I do not know. But my question to you was, I'm not sure how relevant in the end it might be, is to what degree, if any, was the coroner's estimate of at least 30 seconds based upon the nature of the ligature mark? Was it based only on things like the blood under the eyes and so on? Your Honor, I'm not sure that that was really in the record. Okay. What he was suggesting, and he was saying that typically, ligature strangulation takes three minutes on average. He was suggesting that because of the weakened state of the victim, because of his inebriation and his weakened state from the beating, that it would have gone somewhat less than three minutes. Then what's the nature of the evidence we have that it was only 25 seconds? It's the defendant's testimony. That was her statement. That was her statement that it was 25 seconds. So Dr. Sheridan testified a minimum of 30 seconds. But we know that, you know, and she's estimating, presumably she didn't have a stopwatch there. I was going to say she could be lying. I mean, she could have done it for 10 minutes and said, I think it was about 25 seconds. And the jury was clearly free to reject all of her self-serving statements. But the nature of the evidence we have is that 25 seconds is her statement. Yes, Your Honor. With the expert saying a minimum of 30 seconds. Now, 30 seconds is a considerable deliberation. And it's considerably more than you would have in the average case of, for instance, firing a gun or doing any number of killings. 30 seconds is a long time to think about this. But it wasn't simply the 30 seconds. It was the entire duration of this one-sided beating that went on for 25 minutes at a minimum, and perhaps longer. We know it was at least 25 minutes based upon the length of time before the call went dead. But we don't know when during the course of that night, before ever it arrived, that the defendant actually committed the final act of murder. So it could have been considerably longer. And the jury was free to evaluate this testimony, to reject the defendant's self-serving statements, to look at the testimony and conclude this was a lengthy period of time in which there was certainly enough time to deliberate what she was doing to this man whom she was unleashing a one-sided beating on for a very lengthy period. As to the question of express malice, I'd like to clarify that. We don't disagree that express malice must be proven. Certainly that's a requirement of first-degree murder based upon deliberation premeditation. The question simply is what is express malice? And California law is now very clear. Express malice is an intent to kill. And I think there is a reasonable doubt, and I think it's a reasonable doubt that the first-degree murder was the one that was involved. Well, but isn't that kind of broadening the certificate of appealability that we have before us? I totally agree, Your Honor. And that was our comment. And that's why we did not get into that. We simply point out in response that there was certainly express malice here. If this Court concluded that there was sufficient evidence of deliberation premeditation, then if so factored, there's sufficient evidence of express malice. And that's, again, well within the Anderson decision, that deliberation premeditation is express malice plus. Just a few more points. In terms of what the record shows, by the time Everett arrived, she already noticed that the victim was not breathing. And so the suggestion that the pulling him by the T-shirt somehow caused the ligature mark that we see and somehow caused the ligature strangulation really is somewhat fanciful. He was already not breathing by that point. And I don't believe there's any basis and certainly nothing from which we can conclude that it would be unreasonable for the jury to conclude that he was already dead and murdered by that point. Now, were you trial counsel? I was not, Your Honor. Did you, meaning you, the State, argue that the ligature mark was caused by the bra? That was the theory. How do you reconcile the tiny width of it with the size of what I think is likely to have been the bra? Was there any argument about that? No, I don't believe there was, Your Honor. And I think the reason being is it's the same reason that you could ask the same question of opposing counsel. How do you reconcile the fact that a T-shirt could cause a 5-millimeter mark? The point is that even a bra has an edge. And depending upon how the bra is held, if it's held on the edge, you could well envision how it could cause a 5-millimeter bruise. No, I couldn't, actually, because any pulling on that, it's not going to stay on the edge if there's any pressure exerted on it at all. That's just physically not going to happen. Now, the reason I ask this is it seems to me, as I suggested before, that you very well could have had strangulation from the bra without leaving a mark, given the amount of time necessary for this rather inebriated small man, I mean, so on. I mean, I take at face value the coroner's testimony that in this circumstance, you know, you could have strangled that man pretty quickly, and maybe even without a lot of force. But what I'm after is whether or not the State was making what seems to me a very unlikely causation argument, that is to say that the ligature mark was from the bra, and that mark is the sign of the strangulation. It sounds as though the State was making that argument. Indeed. Yeah. In sum, there was ample evidence of motive. She was angry about the humiliation. She chose the object of her humiliation was the State's theory. If she did not actually, if that did not cause the mark by her own admissions, she strangled him with that bra. We know that very much. And so we have motive. We have planning. We have what I have referred to as the trial run. At the very least, by her own statements, she put it around once, gasped. She put it around a second time for 25 seconds. We have the method of killing, the evidence at the scene demonstrating this one-sided onslaught against a weakened individual. That is sufficient evidence, and it cannot be said that no rational juror could reach that conclusion. Was the T-shirt being worn, was this the same one that he had on earlier and he was wearing it? Presumably that is the theory, Your Honor. So presumably the theory being is that he was, after Everett arrived, she said, I think he's dead. And she said, the defendant said, Rocky, Rocky, nothing. So she went over and tried to perform CPR and tried to drag him. And that's the explanation. But already we have the jury being well able to accept Everett's testimony that she arrives and he's dead. He's not breathing. And she can see that. Unless there are any further questions, I would have a senator on it. Your response? I tried to resurrect this circuit's dignity with my response to the 20HA letter regarding Tavazos. But in any way, it's hopeless.  It's hopeless. Well, my friends across the country have asked if the circuit has seceded from the union. But in any event, we argue about that. It's not true that my client was barely injured. That's false. That's actually not true. The record indicates that she had injuries on not only her wrist, but on her back and on her forearms and on her ankles. I want to talk to the Court about the last point I made. But she didn't have any blood, did she? She had some scrapes. To answer your question directly, well, I don't know. Pictures were taken of her a couple of days when she was arrested after the alleged murder. Well, counsel says that the evidence clearly showed that there was blood all over the garage and everything. And I respectfully disagree with that point, too. There appeared to be somebody trying to clean it up. But it doesn't appear – this was not some Helter Skelter Manson scene. The record does not show that, where there's blood all over the wall. Not at all. There was some blood on the floor, which my client and her girlfriend may have tried to clean up. It's not some hell metal spattering of blood, you know, all over the place. I want to talk to the Court about remedy. And I briefed this up in my opening brief. This Court, under 2244B, has the ability to release from custody or other remedy. This Court can fashion a remedy. This Court is not given a yea or nay decision. I do not believe, and I will never believe, that a federal circuit court does not have the ability to fashion some sort of remedy and order the district to provide her some sort of relief. To borrow from Judge Fletcher's comments in the middle here, this is a vastly overcharged case. It's a vastly underproven case. But there's nothing we can do about that. If a prosecutor overcharges a case, there is no remedy for that. I would agree – well, I would agree with that. But what I'm saying is this Court is authorized in the last part of my brief, before the conclusion, my opening brief, to fashion some sort of remedy. This Court has that ability, the circuit. To fashion a remedy for overcharging by a prosecutor? No. No, Your Honor. To correct the verdict, to line up a verdict with what the evidence shows and what the facts show. I have won and lost first-degree murder cases, and this is so unlike any first-degree murder case I've ever seen. This has never been a first-degree murder. It will never, ever be a first-degree murder. And I would ask this Court to fashion some sort of remedy for this petitioner. Thank you. Well, some jurors might think that, you know, beating an old man to death is first-degree murder. I don't know. I mean, that's why the jury gets to do what it does and we do what we do. It's really difficult for us to try to fashion a remedy that takes away the jury's verdict. I think that's what you're asking us to do. It's jury nullification from the bench. Well, it's stated in 2244B, so that's where I come from. Thank you, Your Honor. Thank you. Thank both sides for your arguments. The case of Chavez v. Lattimore now submitted for decision.
judges: Mills, Fletcher, Rawlinson